UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


RICHARD LARUE,                    )
                                  )
          Plaintiff,              )
                                  )    Case No. 4:08CV00183 FRB
                                  )
          v.                      )
                                  )
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
                                  )
          Defendant.              )


**<u>MEMORANDUM AND ORDER</u>**


          This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All matters are pending
before the undersigned United States Magistrate Judge, with consent
of the parties, pursuant to 28 U.S.C. § 636c.

**I.    Procedural Background**

          On March 16, 2006, plaintiff Richard Larue ("plaintiff")
applied for Disability Insurance Benefits ("DIB") and Supplemental
Security Income ("SSI") alleging disability as of February 24, 2006
due to angina, chronic obstructive pulmonary disease ("COPD"),
emphysema, heart problems, and arthritis.  (Administrative
Transcript ("Tr.") 92-99; 110.)  Plaintiff's applications were
initially denied, and he requested a hearing before an
administrative law judge ("ALJ").  (Tr. 66-67; 70-74; 77.)  On

1

August 1, 2007, a hearing was held before ALJ Robert E. Ritter, and on August 30, 2007, ALJ Ritter issued his decision denying plaintiff's applications. (Tr. 8-65.)

Plaintiff subsequently filed a Request for Review of Hearing Decision with defendant agency's Appeals Council, which denied plaintiff's request for review on December 3, 2007. (Tr. 2-7.) This decision of the ALJ thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.    Plaintiff's Testimony

During his administrative hearing, plaintiff was represented by attorney Eve Dake. Plaintiff initially responded to questioning from his attorney. Plaintiff was 54 years old, and had been married for 19 years. (Tr. 25-26.) He was five feet, seven inches tall, and weighed 168 pounds, his normal weight. (Tr. 62.) He lived in a two-bedroom apartment located on the second floor of his building. (Tr. 36-38.) Plaintiff testified that he attended regular school through the first grade, and then attended special school until he left school completely at the age of 16.[1] (Tr. 26.) Plaintiff testified that, while in special school, he learned mainly "arts and crafts" and did not learn reading, writing, or math. (Tr. 27.) Plaintiff testified that he was unable to read the TV Guide or any part of the newspaper, including the cartoons,

---

[1]In his Disability Report, plaintiff indicated that he completed "auto body hvca mold training" in the spring of 2005. (Tr. 117.)

and also testified that he was unable to balance a checkbook or count money. (Tr. 27-28.) He also testified that his wife had filled out his Social Security application forms. (Tr. 29.)

Plaintiff testified that he had previously worked steadily, doing maintenance work such as painting, some lifting, electrical work, and carpentry. Id. He testified that, as a child, he learned to do this work from his grandfather. (Tr. 30.) Plaintiff testified that, when working as a carpenter, he could not use a tape measure, and that his supervisor would tell him what to do. (Tr. 30-31.) He also testified that he sometimes called his wife to ask her how to spell words or to ask for other help. (Tr. 31.)

Plaintiff testified that he stopped working because of his breathing problems, stating that he became out of breath while climbing stairs or carrying his pouch of tools, which weighed 20 pounds. (Tr. 32.)[2] Plaintiff testified that he was still having breathing problems, which he described as a heaviness, and stated that stair climbing, walking, carrying groceries or laundry and sometimes standing caused breathing difficulty. (Tr. 33.)

Plaintiff testified that he was a heavy smoker, and that his doctors had repeatedly told him to stop. Id. Plaintiff testified that he recently tried to quit smoking, but that he felt

---

[2]On his Disability Report, plaintiff indicated that he stopped working "because they wanted more work done in 8 hours than I could do my breathing and chest pains would cause me to have to take breaks." (Tr. 110.)

so terrible after seven days that he decided to just smoke when he needed to. (Tr. 33-34.) Plaintiff testified that he did several things to avoid smoking, such as going to the store, or to WalMart, and walking around to avoid smoking. (Tr. 34.) Plaintiff testified that he was down to smoking only one pack per day, but that his breathing had not improved. (Tr. 34-35.)

Plaintiff testified that he suffered from arthritis in his hands, neck and legs. Id. Plaintiff testified that he had a hard time ripping, or holding on to things with his hands. (Tr. 36.) He also testified that he could not turn his neck. Id.

Regarding his daily activities, plaintiff testified that he helped with vacuuming, sweeping and mopping, but was only able to work for about 15 or 20 minutes before he had to sit down. (Tr. 36-37.) Plaintiff testified that doing dishes and picking up items was hard for him because he got out of breath while bending. (Tr. 37.) Plaintiff testified that he helped with grocery shopping, but that he had trouble walking around the store and carrying the grocery bags, especially up the two flights to his apartment. (Tr. 37-38.) Plaintiff testified that his wife did the cooking, and that he did no yard work. (Tr. 38.)

Plaintiff testified that he had a driver's license, but could not read directions from a map, and that his wife had to help him interpret the attorney's directions to the hearing that day. Id. He testified that he had ultimately taken his driving test orally after failing the written test six times. (Tr. 39.) He

4

testified that, while driving, his hands went numb. (Tr. 38-39.)

Plaintiff testified that he enjoys playing the guitar, but that pain in his hands prevents him from playing for longer than 15 minutes per day. (Tr. 39-40.) Plaintiff testified that he plays by ear, and cannot read music. (Tr. 40.)

Plaintiff testified that he has trouble standing in one spot for very long due to shortness of breath and pain in his legs. Id. Plaintiff testified that he would be unable to walk through a grocery store two or three times in a day because he would have a very hard time breathing. (Tr. 40-41.)

At this point, plaintiff stated that he wished to add something, and he and his attorney conferred privately. (Tr. 41.) Plaintiff then testified on the record that, if he walks through a store, like WalMart, for a long period of time, he had a hard time breathing and his heart rate increases. Id.

Plaintiff then responded to questions from the ALJ. Plaintiff testified that he was able to walk around WalMart for about ten minutes before he became short of breath. (Tr. 42.) He testified that he had tried to gradually increase the time he spent walking to build tolerance, but that the longest he was able to walk was 15 minutes, but that he felt "terribly tired and exhausted" afterwards. Id. Plaintiff testified that he was currently unable to walk for 15 minutes. (Tr. 43.) The ALJ then asked plaintiff, "Have you had a rapid loss of your capacity to breath [sic] over a six month period, a year period, a week

5

period?" Id. Plaintiff replied "[s]ix months." Id. The ALJ asked plaintiff whether anything had happened during that time that would have caused a worsening of his breathing, and plaintiff replied in the negative. Id.

The ALJ asked plaintiff when he was last "engaged in an exercise program to see how far [he] could walk," and plaintiff replied that he did not remember. (Tr. 44.) Plaintiff testified that he could only lift ten pounds, and that lifting more than this would cause him to become out of breath. Id. When asked whether he could change a car tire, plaintiff testified that he could do so, but that it would be hard. Id. Plaintiff estimated that the force required to break loose a lug nut on a car tire would be equivalent to lifting 20 pounds. (Tr. 45.) Plaintiff testified that he took out the trash every day, which involved lifting ten pounds, carrying it 50 feet, and putting it in a dumpster. (Tr. 50-51.) He testified that, after putting the trash into the dumpster and walked back to the steps, he stood for a second before going back up, and also stopped to rest on the first landing. (Tr. 51-52.)

Plaintiff testified that he could vacuum for five minutes before becoming short of breath. (Tr. 45.) He testified that the dust from the vacuum cleaner bothered him, although he had never seen an allergist or been told that he had an allergy. Id. He testified that he had undergone tests to measure blood oxygen content, and that he was told that he had a low blood oxygen level.

(Tr. 46.)  Plaintiff testified that he had undergone testing, and
been told that he had COPD and emphysema.  (Tr. 47.)  He testified
that, for the past year, he has taken Advair,[3] Albuterol[4] and a
capsule on a daily basis for his lungs, and that the medication
made him feel better.  (Tr. 47-48.)  Plaintiff stated that he had
not suffered from pneumonia during the past year.  (Tr. 48.)  He
stated that he was hospitalized overnight on one occasion.  (Tr.
49.)  Plaintiff does not use oxygen at home, nor does he use any
device to aid sleep, although he testified that he sleeps poorly
and wakes up coughing.  (Tr. 49-50.)

Regarding his heart condition, plaintiff testified that
his problems were mostly related to his lungs.  (Tr. 52.)  He
testified that he had had a heart attack.  Id.  Plaintiff testified
that he sees a doctor for arthritis, but that this doctor does not
prescribe any medication for his arthritis.  (Tr. 53.)  Plaintiff
testified that he used an arthritis cream for his hand pain.  Id.
Plaintiff testified that his left hand felt like it wanted to form
into a claw, and that he sometimes had to pry it open.  (Tr. 53-
54.)  Plaintiff also testified that, while eating, he sometimes
dropped utensils because his hand locked up.  (Tr. 54.)  Plaintiff

---

[3]Advair is a combination of the drugs Fluticasone and Salmeterol, and is
used to prevent wheezing, shortness of breath, and breathing difficulties
caused by asthma and COPD.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699063.html

[4]Albuterol is used to prevent and treat wheezing, difficulty breathing
and chest tightness caused by lung diseases such as asthma and COPD.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a607004.html

testified that he had never had x-rays to confirm arthritis, but that he had nodules on his fingers. (Tr. 55.) Plaintiff testified that he once punched a door and fractured his left hand, but that he recovered. (Tr. 56.)

Plaintiff said that he had not looked for work in the last year. (Tr. 57.) He testified that there was no work that he had done in the past that he felt currently able to do, and also said that he would not be able to perform a job involving only sitting. Id. He testified that he became short of breath while doing nothing, and also stated that certain smells caused shortness of breath. (Tr. 58.)

When asked what other conditions limited his ability to work, plaintiff testified that he had trouble with his nerves, and that his thoughts raced. Id. Plaintiff also testified that he felt angry and defensive; that he argued with his wife; that he was hard to get along with; and that he sometimes wanted to get into physical fights with people. (Tr. 59-60.) He testified that his primary care doctor had never advised him to seek psychological help, and he took no medication to calm his anger. Id. When the ALJ asked plaintiff whether he felt he should seek psychological treatment, plaintiff said no, and explained that he simply tried to control himself. (Tr. 60.)

Plaintiff testified that he had trouble talking on the telephone, and testified that, since he stopped working, his problems had worsened. (Tr. 61.) He stated that he would not be

able to take his trash out three or four times per day, and testified that he had to limit what he could do with his hand even after applying the analgesic cream. (Tr. 61-62.)

    2.  <u>Medical Records</u>

Records from Southwest Medical Center, Inc., the office of Radha Patnana, M.D., include a note documenting plaintiff's office visit with George Katsantonis, M.D., who evaluated plaintiff following the surgical removal of a mass from the left side of his face. (Tr. 204.) Plaintiff reported doing well. <u>Id.</u> It was noted that the left-sided facial discharge had completely subsided, and that his incision was healing satisfactorily. <u>Id.</u> He was advised to clean the area with peroxide every other day, and was also advised that he had a parotid tumor on the right which required medical attention. <u>Id.</u> Dr. Katsantonis advised plaintiff to follow up in three months. (Tr. 204.)

On February 16, 2005, plaintiff saw Dr. Patnana with complaints of cough, weakness, and general body aches for the preceding six days. (Tr. 202.) Plaintiff had a low-grade fever and chills, but no cough or expectoration. <u>Id.</u> It was noted that plaintiff reported smoking cigarettes and using alcohol, and that he was advised to quit. <u>Id.</u> Physical and psychiatric exam were normal. (Tr. 203.) Pulmonary Function Study revealed a resting oxygen saturation of 97% and a forced expiratory volume of 75%,

indicating "mild" restriction.[5]  (Tr. 214-15.)  It was opined that plaintiff's symptoms were most likely due to a virus, and he was advised to take Tylenol as needed.  (Tr. 202.)

Plaintiff saw Dr. Patnana on April 11, 2005 with complaints of right arm pain and numbness that began in his neck and traveled to his right upper extremity.  (Tr. 200.)  Plaintiff stated that his symptoms were worse when he was seated.  Id.  It was noted that plaintiff reported smoking cigarettes and using alcohol, and that he was advised to quit.  Id.  Plaintiff was tender over his lateral scapular area, but physical and psychiatric exam were normal, and it was noted that he was not short of breath.  (Tr. 200-01.)  Examination of his musculoskeletal system revealed normal range of motion, and normal muscle strength and tone.  (Tr. 201.)  Nerve conduction studies were consistent with "mild" left median neuropathy at the wrist, and right ulnar neuropathy at the elbow.  (Tr. 205-07.)  Plaintiff was given Ibuprofen and advised to call if his symptoms worsened.  Id.

Records from Forest Park Hospital indicate that plaintiff presented on July 7, 2005 with complaints of constant chest pain, rated at a 2/10, which was exacerbated by cough and breathing, and relieved by rest.  (Tr. 221, 223.)  Plaintiff stated that his pain began when he lifted an air conditioner when he was at work.  (Tr. 223.)

---

[5]It is indicated that a percentage of above 80% was normal.  (Tr. 214.)

Plaintiff did not complain of shortness of breath, palpitations or swelling.  (Tr. 221.)  It was noted that plaintiff had angina twice in the early 1980s, and emphysema in 1996, but that this was stable on an Atrovent inhaler.  (Tr. 221, 224.) It was noted that his home medications were aspirin and Nitropaste,[6] but that he had not used the Nitropaste in a long time.  (Tr. 221, 223.)

Physical exam showed plaintiff to be alert and oriented and in no distress.  (Tr. 226.)  His vital signs were normal; his lungs were well-ventilated; his heart had a regular rate and rhythm; and there was no edema in his extremities.  Id.  An EKG showed no acute changes, and plaintiff's cardiac enzymes were negative.  (Tr. 221.)

Plaintiff was kept overnight and a stress test was performed the following day, the results of which were normal. (Tr. 221, 231-32.)  It was noted that plaintiff had good exercise tolerance, and that there was no exercise-induced chest discomfort. (Tr. 232.)  It was noted that plaintiff had a normal heart rate and blood pressure response to exercise, and that there were no diagnostic EKG changes.  Id.  Plaintiff was discharged home, and was advised to avoid lifting over five pounds for the next two weeks, and to follow up with his primary care physician in one week.  (Tr. 222.)  He was advised to have outpatient pulmonary

---

[6]Nitroglycerine is used to prevent chest pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682346.html

function tests at the hospital's Cardiopulmonary Lab on July 11, 2005, and to avoid smoking.  Id.

Plaintiff returned to Forest Park Hospital on July 11, 2005.  (Tr. 217.)  Pulmonary function tests were performed and interpreted by Korgi Hegde, M.D. as being within normal limits.  (Tr. 219.)

On July 12, 2005, plaintiff saw Dr. Patnana in follow-up from his hospital admission.  (Tr. 198.)  He reported that he had been admitted to the hospital for chest pain; that his symptoms had begun when he was lifting heavy weights; and that he generally noticed symptoms when he coughed, or moved or lifted heavy objects.  (Tr. 198.)  Dr. Patnana noted that the stress tests were within normal limits.  Id.  Upon exam, plaintiff's mood and affect were normal, and he was well-oriented. (Tr. 199.)  He was tender in his chest.  Id.  Dr. Patnana's impression was chest wall pain, and he prescribed Naproxen[7] and rest with no lifting of over five pounds, and no bending.  (Tr. 198.)

Plaintiff returned to Dr. Patnana on December 29, 2005 with complaints of an inability to breathe, a stuffy nose, and a cough.  (Tr. 196.)  Upon exam, plaintiff was noted to wheeze.  (Tr. 197.)  Plaintiff was diagnosed with bronchitis and given Omnicef

---

[7]Prescription-strength Naproxen is a non-steroidal anti-inflammatory medication used to relieve pain, tenderness, swelling and stiffness caused by different forms of arthritis.  Non-prescription strength Naproxen, also known as Aleve, is used to reduce fever and relieve mild pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html

(an antibiotic) and prednisone.[8]  (Tr. 196.)

On April 13, 2006, Judith A. McGee, Ph.D., completed a Psychiatric Review Technique form.  (Tr. 149-62.)  Dr. McGee indicated that plaintiff had no medically determinable impairments. (Tr. 149.)  Dr. McGee wrote that the medical records did not support a psychiatric diagnosis, nor did they support memory problems or learning problems.  (Tr. 161.)

Records from Family Care Health Centers, the office of Dr. Glick, indicate that plaintiff was seen on June 27, 2006 to establish care.  (Tr. 234.)  Plaintiff gave a history of COPD and hypertension, and reported having quit smoking one month ago.  _Id._ It was noted that plaintiff had previously undergone the surgical removal of a benign submandibular lymph node, and it was also noted that his lymph nodes were enlarged, likely secondary to periodontal disease.  _Id._  Plaintiff's lungs were clear.  _Id._  He was given Advair, Albuterol, Lisinopril,[9] and Lipitor,[10] and advised to follow

---

[8]Prednisone is a corticosteroid, and is used alone or with other medications to treat the symptoms of low corticosteroid levels (lack of certain substances that are usually produced by the body and are needed for normal body functioning). Prednisone is also used to treat other conditions in patients with normal corticosteroid levels. These conditions include certain types of arthritis; severe allergic reactions; multiple sclerosis (a disease in which the nerves do not function properly); lupus (a disease in which the body attacks many of its own organs); and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html

[9]Lisinopril is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html

[10]Lipitor, or Atorvastatin, is used along with diet, exercise, and weight-loss to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease.

up in six weeks.  (Tr. 234.)

Dr. Glick's records indicate that plaintiff cancelled his August 8, 2006 appointment.  (Tr. 235.)

Plaintiff returned to Dr. Glick on December 15, 2006 and complained of shortness of breath upon exertion despite taking Albuterol and Advair, and reported that he was still smoking some. Id.  Faint wheezes were noted upon exam, but the remainder of the exam was normal.  Id.  Plaintiff was started on Spiriva,[11] and it was recommended that he have a flu vaccine, but he refused.  Id.

Plaintiff cancelled his February 13, 2007 appointment. (Tr. 237.)  He returned on April 11, 2007, and it was noted that his COPD symptoms were still present upon exertion.  Id.  Dr. Glick wrote, "[h]e still smokes some."  Id. (emphasis in original.)  He denied chest pain.  Id.  Upon exam, it was noted that plaintiff had a nodule on his right posterior mandibular border, and that he had "severe end-stage dental disease."  (Tr. 237.)  Smoking cessation was strongly encouraged, plaintiff's medications were continued, and he was advised to seek an ENT consult for the enlarged lymph node.  Id.

On May 1, 2007, plaintiff apparently called and requested an appointment, complaining of pain in his neck and numbness in his

_____

http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600045.html

[11]Spiriva, or Tiotropium, is used to prevent wheezing, shortness of breath, and difficulty breathing in patients with COPD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604018.html

left hand. (Tr. 238.) He presented to the office on May 3, 2007 with complaints of mild neck pain and numbness in his fingers. Id. Upon exam, he had full neck range of motion, and normal upper extremity strength. Id. Tinel's sign[12] was negative bilaterally. Id. He was diagnosed with non-radiating neck pain and hand numbness, and advised to use ice and Naproxen as needed. Id.

Plaintiff was seen at the ENT clinic of St. Louis ConnectCare on June 13, 2007 for evaluation of the apparent enlarged lymph node, and had complaints of neck pain and difficulty swallowing. (Tr. 243.) Complaints related to the instant applications are not noted. See Id.

3. School Records

The record includes an October 11, 1967 "Report of Special District Evaluation Clinic" evaluation of plaintiff at the age of fourteen years, three months. (Tr. 187-89.) A psychological evaluation was performed, and it was noted that plaintiff was friendly and verbal, with no overt anxiety. (Tr. 188.) Plaintiff's March 20, 1961 Stanford-Binet Intelligence Scale test result of a 69 I.Q. were noted. Id.

It is indicated that the Wechsler Intelligence Scale for Children and the Bender-Gestalt tests were administered. (Tr. 188.) On the Wechsler, plaintiff scored a verbal scale I.Q. of 66,

---

[12]Tinel's sign is a test to detect carpal tunnel syndrome. It is administered by tapping over the median nerve at the wrist. If pain shoots from the wrist to the hand, it is said that Tinel's sign is positive. http://www.nlm.nih.gov/medlineplus/ency/article/000433.htm

with a performance scale I.Q. of 68 and a full-scale I.Q. of 64. <u>Id.</u>  The examiner noted that plaintiff's reproductions of the Bender-Gestalt figures indicated a possible visual impairment.  <u>Id.</u> It was recommended that plaintiff be placed in the "Educable Mentally Retarded" program.  (Tr. 189.)

## III.    The ALJ's Opinion

The ALJ found that plaintiff had met the insured status requirements of the Social Security Act ("Act") through December 31, 2010.  The ALJ found that plaintiff had not engaged in substantial gainful activity since February 24, 2006, the alleged onset date.  The ALJ found that plaintiff had the medically determinable impairments of emphysema, chest pain, and left hand neuropathy, but did not have an impairment or combination of impairments that had, or would be expected to, significantly limit plaintiff's ability to perform basic work-related activities for 12 consecutive months.  The ALJ concluded that plaintiff therefore did not have a severe impairment or combination of impairments, terminating the evaluation at step two.

In analyzing plaintiff's credibility, the ALJ cited 20 C.F.R. § 404.1529(c) and 416.929(c) and listed the factors noted by the Eighth Circuit in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984).  The ALJ analyzed the evidence in conjunction with those factors, and concluded that, while plaintiff's medically determinable impairments could reasonably be expected to produce

some of the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible.

The ALJ concluded that plaintiff had not been under a disability, as defined in the Act, from February 24, 2006 through the date of the decision.

## IV. Discussion

To be eligible for supplemental security income under the Social Security Act, a plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. See 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A) (defining "disability" for DIB and SSI purposes). The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Id. It further specifies that a person must be both unable to do his previous work and unable, "considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy,

regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied.

At step two, the Commissioner determines, based on the medical evidence, whether the claimant has an impairment or combination of impairments that significantly limits his ability to perform basic work activities. See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)). Objective medical evidence must confirm that an impairment is severe.

At the third step, the Commissioner determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's

18

impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), (citing <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993)). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

      1.   The credibility findings made by the ALJ;

      2.   The plaintiff's vocational factors;

      3.   The medical evidence from treating and

consulting physicians;

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.  Any corroboration by third parties of the plaintiff's impairments;

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585–86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing Cruse, 867 F.2d at 1184.

In the case at bar, plaintiff challenges the ALJ's decision to terminate the sequential evaluation process at step two, arguing that the ALJ erroneously found that he does not have a severe impairment. In support, plaintiff argues that his school records establish that he had school records confirming I.Q. scores consistent with mental retardation, and that he had medical findings relative to a severe lung impairment and bilateral upper

extremity neuropathies.  Plaintiff also contends that the ALJ erroneously failed to analyze his claim under Listing 12.05(C). Plaintiff finally argues that the ALJ failed to consider the combined effect of all of his impairments.  In response, the Commissioner contends that substantial evidence supports the ALJ's decision.  For the following reasons, the Commissioner's arguments are well-taken.

    1.    The ALJ's Step Two Findings

    The ALJ in this case terminated the sequential evaluation process at step two, having found that plaintiff did not have an impairment, or combination of impairments, that was "severe" within the meaning of the Regulations.  Having reviewed the record, the undersigned determines that substantial evidence supports this decision.

    The sequential evaluation process may be terminated at step two when an impairment or combination of impairments would have no more than a minimal effect on the claimant's ability to work.  Nguyen, 75 F.3d at 431.  As the Commissioner correctly notes, the severity of a medically ascertained impairment must be measured in terms of its effect upon ability to work, and not in terms of deviation from standards of perfection.  McCruter v. Bowen, 791 F.2d 1544, 1547 (8th Cir. 1986).

    A.    Objective Medical Findings

    In determining that none of the conditions plaintiff alleged were severe, the ALJ analyzed the medical evidence of

21

record and determined that it contained nothing indicating that any of plaintiff's conditions were limiting, or that they would restrict his activities. The lack of objective findings is strong evidence of the lack of a severe impairment. <u>Stephens v. Shalala</u>, 50 F.3d 538, 541 (8th Cir. 1995).

Regarding plaintiff's left upper extremity, the ALJ noted that, although plaintiff alleged debilitating arthritis, there was no medical evidence in the record indicating that plaintiff had ever been diagnosed with arthritis. The ALJ also noted that a nerve conduction study performed on April 11, 2005, ten months prior to the alleged onset date, revealed only mild left median neuropathy with a normal left ulnar nerve conduction. The ALJ further noted that the record contained "no additional tests or findings that would indicate any further limitation or restriction regarding [plaintiff's] ability to use his hand for fine or gross manipulation." Consistent with the ALJ's observation, the undersigned notes that, when plaintiff was seen by Dr. Glick on May 3, 2007, he had normal upper extremity strength, and Tinel's sign was negative bilaterally.

Regarding plaintiff's allegation of debilitating chest pain, the ALJ noted that the record contained no evidence indicating the presence of a medically determinable impairment. The ALJ noted that an electrocardiogram indicated normal sinus rhythm and tracing, and that both exercise treadmill testing and thallium images were normal. The ALJ also noted that no cardiac

medications were ever prescribed. The ALJ concluded that such results indicated no angina or any other cardiac impairment that could limit his physical or mental ability to do basic work activities.

The ALJ also noted that a pulmonary study performed on February 16, 2005 was interpreted as demonstrating merely a mild respiratory restriction, and that another such study performed on July 11, 2005 was essentially within normal limits.

Finally, the ALJ noted that, while plaintiff's school records indicated that he had a low I.Q., he had nonetheless performed substantial gainful activity for the past 30 years. The ALJ concluded that plaintiff's low I.Q. did not indicate that he had been limited in his physical or mental ability to do basic work activities due to his mental condition. The ALJ also noted that plaintiff never sought psychiatric treatment, and took no psychotropic medication for any mental ailment.

In sum, this record simply contains no medical findings of sufficient significance to support the conclusion that any of plaintiff's impairments were severe. See Stephens, 50 F.3d at 541. The undersigned further notes that, in cases with medical findings more consequential than those in the case at bar, an ALJ's decision to terminate the sequential evaluation process at step two has been upheld. Johnston v. Apfel, 210 F.3d 870, 871-75 (8th Cir. 2000) (affirming step two denial despite diagnoses of hyperthyroidism and related vision problems, probable panic and anxiety disorder, and

occasional slow heart rate); Nguyen, 75 F.3d at 431 (affirming step two denial despite diagnosis of osteoarthritis.)

B. Credibility Determination

In addition to determining that no objective medical evidence supported the conclusion that plaintiff had any severe impairments, the ALJ properly discounted plaintiff's credibility in evaluating plaintiff's testimony that his symptoms were severe.

"A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." Polaski, 739 F.2d at 1321. However, testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged physical impairment. Id.; Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1)

the claimant's daily activities; (2) the
duration, frequency and intensity of the pain;
(3) precipitating and aggravating factors; (4)
dosage, effectiveness and side effects of
medication; (5) functional restrictions."

Id. at 1322.

Although the ALJ is not free to accept or reject the
claimant's subjective complaints based upon personal observations
alone, he or she may discount such complaints if there are
inconsistencies in the evidence as a whole.  Id.  The "crucial
question" is not whether the claimant experiences symptoms, but
whether his credible subjective complaints prevent him from
working.  Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).
When an ALJ explicitly considers the Polaski factors and discredits
a claimant's complaints for a good reason, that decision should be
upheld.  Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The
credibility of a claimant's subjective testimony is primarily for
the ALJ, not the courts, to decide, and the court considers with
deference the ALJ's decision on the subject.  Tellez v. Barnhart,
403 F.3d 953, 957 (8th Cir. 2005).

In making his credibility determination, the ALJ cited
the Regulations corresponding with Polaski, and listed the
appropriate factors therefrom.  The ALJ then found that, while
plaintiff's medically determinable impairments could reasonably be
expected to produce some of plaintiff's alleged symptoms,
plaintiff's statements concerning the intensity, persistence and

limiting effects of those symptoms were not entirely credible.

As discussed, _supra_, the ALJ noted that pulmonary function testing yielded findings that were either mild or within normal limits.  The ALJ also noted that the results of spirometry (testing done to measure lung function) were good.  Furthermore, as noted above, the ALJ had also noted the lack of objective medical evidence supporting plaintiff's other allegations.  The ALJ properly considered this evidence as detracting from plaintiff's allegations of debilitating symptoms.  See Cruse, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); see also Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).

The ALJ also noted that plaintiff infrequently sought medical treatment for his respiratory symptoms.  The ALJ wrote that it was reasonable to assume that if a person "was suffering from multiple or even one ailment that would significantly limit his physical or mental ability to do basic work activities, he would seek treatment on a more consistent or persistent basis than is demonstrated in [plaintiff's] longitudinal medical treatment." (Tr. 16.)  A lack of regular and sustained treatment is a basis for discounting complaints, and is an indication that the claimant's

impairments are not severe, and are not significantly limiting for twelve continuous months. <u>Novotny v. Chater</u>, 72 F.3d 669, 671 (8th Cir. 1995); <u>see</u> <u>also</u> <u>Onstead v. Sullivan</u>, 962 F.2d 803, 805 (8th Cir. 1992) (the absence of ongoing medical treatment is inconsistent with subjective complaints of pain); <u>Gwathney v. Chater</u>, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her subjective complaints of disabling conditions).

The ALJ also noted that no physician recommended that plaintiff stop working. <u>See</u> <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 590 (8th Cir. 2004) (adverse credibility determination supported by finding that no physician had imposed any work-related restrictions). The ALJ also noted that there were no medical records indicating that plaintiff had any symptoms that were not controlled by medication. <u>See</u> <u>Brown v. Barnhart</u>, 390 F.3d 535, 540 (8th Cir. 2004) (an impairment which can be controlled with medication or treatment is not considered disabling.) The ALJ noted that the record contained no other evidence, such as documentation from a prior employer, tending to suggest that plaintiff was unable to work due to any ailment.

The undersigned additionally notes that plaintiff continued to smoke cigarettes, despite the fact that he claimed to suffer debilitating lung symptoms, and despite the fact that he was repeatedly advised by doctors to stop. The fact that a claimant

fails to quit smoking is a factor detracting from credibility. <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257 (8th Cir. 1997).

Review of the record shows that, in a manner consistent with <u>Polaski</u>, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility. "Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony." <u>Polaski</u>, 739 F.2d at 1322; <u>see</u> <u>also</u> <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ explicitly discredited plaintiff's testimony and gave good reasons for doing so, this Court must defer to the ALJ's credibility determination. <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007).

Based upon the foregoing reasons, the undersigned determines that substantial evidence supports the conclusion that plaintiff did not suffer from a severe impairment that would have more than a minimal effect on his ability to work. The ALJ's decision to terminate the sequential evaluation at step two must therefore be affirmed. <u>See</u> <u>Simmons v. Massanari</u>, 264 F.3d 751, 755-756 (8th Cir. 2001) (citing <u>Johnston</u>, 210 F.3d at 874.)

2.    <u>Listing 12.05(c)</u>

As noted above, the ALJ in this case terminated the sequential evaluation process at step two, after properly finding that plaintiff did not have any severe impairment or combination of

impairments.  Plaintiff argues that the ALJ erroneously failed to find that he met the requirements of Listing 12.05(C), the listing for mental retardation.  Review of the record reveals no error.

The listing for mental retardation, Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P., App. 1 (2001), describes mental retardation as, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." To meet 12.05(C), a plaintiff must show "(1) a valid verbal, performance, or full scale I.Q. of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006)

In this case, the record contains plaintiff's school records from October of 1967, indicating the results of I.Q. testing.  On the Wechsler Intelligence Scale for Children, plaintiff scored a verbal scale I.Q. of 66, with a performance scale I.Q. of 68 and a full-scale I.Q. of 64. On the Bender-Gestalt, the examiner noted that plaintiff's performance suggested a possible visual impairment. It was recommended that plaintiff be placed in the "Educable Mentally Retarded" program.  (Tr. 189.)

While an I.Q. test is helpful in determining whether an applicant has a mental impairment, it is not dispositive, and other

information illustrating the claimant's ability to function can be used to discredit the results of an I.Q. test. <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1071 (8th Cir. 2004)(citing <u>Holland v. Apfel</u>, 153 F.3d 620, 622 (8th Cir. 1998)). The Eighth Circuit has emphasized that I.Q. scores must be valid; that the Commissioner need not rely exclusively on I.Q. scores; and that the Commissioner may disregard test scores that are inconsistent with a claimant's demonstrated activities and abilities as reflected in the record as a whole. <u>Muncy v. Apfel</u>, 247 F.3d 728, 733 (8th Cir. 2001); <u>Clark v. Apfel</u>, 141 F.3d 1253, 1255 (8th Cir. 1998).

Plaintiff did not claim low I.Q. or mental retardation in his applications. However, plaintiff testified that he was in special education in school and that he had significant restrictions in areas such as reading and math, and the ALJ therefore properly recognized the need for further inquiry and investigated the claim. <u>See</u> <u>Battles v. Shalala</u>, 36 F.3d 43, 44-45 (8th Cir. 1994) (an ALJ has an obligation to investigate a claim not presented in the application for benefits when testimony at the hearing places him on notice of the need for further inquiry.)

The ALJ noted that the record indicated that plaintiff was found to have a low I.Q., but that his work record indicated that any intellectual deficit did not prevent him from performing substantial gainful activity for the preceding 30 years. The ALJ then properly concluded that plaintiff's low I.Q. scores did not indicate that he was limited in his physical or mental ability to

do basic work activities.  It is proper for an ALJ to reject I.Q. scores when, as here, they are inconsistent with the rest of the record.  <u>Clark</u>, 141 F.3d at 1255; <u>see</u> <u>also</u> <u>Muncy</u>, 247 F.3d at 733 (an ALJ may disregard test scores that are inconsistent with a claimant's demonstrated abilities.)

In addition, the undersigned notes that this record contains no credible evidence that plaintiff's intellect had worsened since his working years.  A condition that was present but not disabling during working years and has not worsened  cannot be used to prove a present disability.  <u>Orrick v. Sullivan</u>, 966 F.2d 368, 370 (8th Cir. 1992) (<u>per</u> <u>curiam</u>); <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990).  Plaintiff therefore does not meet the first requirement of 12.05(C).

Nor does plaintiff satisfy the third requirement of 12.05(C), which requires the presence of a physical or other mental impairment imposing an additional and significant work-related limitation of function, i.e., a 'more than slight or minimal' effect on the ability to perform work." <u>Maresh</u>, 438 F.3d 897, 900 (citing <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1011 (8th Cir. 2000)).  As discussed above, the ALJ in this case properly terminated the sequential evaluation process at step two, having found that plaintiff did not have an impairment or combination of impairments that had, or would be expected to, limit his ability to perform work.

Nor was there any error in the ALJ's failure to consider

plaintiff under 12.05(C), inasmuch as he had discredited plaintiff's I.Q. scores, and had found no proof of any other physical or mental impairment imposing an additional and significant work-related limitation of function. See Goose v. Apfel, 238 F.3d 981, 984 (8th Cir. 2001) (ALJ was not under an obligation to consider plaintiff under § 12.05, as there was no proof that he was mentally retarded before age 22.)

3. Impairments in Combination

Plaintiff finally contends that the ALJ erroneously failed to consider all of his impairments, including his low I.Q., in combination. The Regulations require an ALJ to consider the combined effects of the plaintiff's physical and mental impairments to determine whether the combination of impairments is medically equal to a listed impairment. Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004); Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003). In the case at bar, after the ALJ listed all of the physical and mental impairments plaintiff alleged, he expressly stated that he had considered the combined effect of plaintiff's impairments in accordance with the Regulations. This is sufficient. "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." Browning, 958 F.2d 817, 821 (8th Cir. 1992) (citing Gooch v. Secretary of H.H.S., 833 F.2d 589, 592 (6th Cir. 1987)). Review of the record persuades the undersigned that the ALJ properly considered plaintiff's impairments in combination.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of March, 2009.